1          IN THE DISTRICT OF THE UNITED STATES OF AMERICA
              FOR THE SOUTHERN DISTRICT OF ILLINOIS
2     _____
                                      )
3     **UNITED STATES OF AMERICA,**        )
                                      )
4                    Plaintiff(s),   )
                                      )
5          vs.                        )   Case No. **08-30139-01**
                                      )
6     **JOSEPH DIEKEMPER,**                )
                                      )
7                    Defendant(s).    )
      _____)
8

9                         **SENTENCING**

10

11

12

      BE IT REMEMBERED AND CERTIFIED that heretofore on  **4/13/2009,**
13    the same being one of the regular judicial days in and for the
       United States District Court for the Southern District of
14    Illinois, Honorable G. Patrick Murphy, United States District
      Judge, presiding, the following proceedings were recorded by
15     mechanical stenography; transcript produced by computer.

16

17                       **APPEARANCES:**

18    *FOR PLAINTIFF:*   **Jennifer D.L. Hudson**, Assistant U.S. Attorney
      - Fairview Heights, 9 Executive Drive, Suite 300, Fairview
19    Heights, IL 62208

20    *FOR DEFENDANT*: **Gilbert C. Sison** and **Scott Rosenblum** of
      Rosenblum, Schwartz et al., 120 South Central Avenue, Suite
21    130, Clayton, MO 63105

22    *REPORTED BY*:  **Molly N. Clayton, RPR**, Official Reporter for
      United States District Court, SDIL, 750 Missouri Ave., East St.
23    Louis, Illinois 62201, (618)482-9226,
                      *molly_clayton@ilsd.uscourts.gov*
24

25

1                    **INDEX OF WITNESS EXAMINATION**

2                                        **DX**      **CX**     **R-DX**      **R-CX**

3     No witness testimony.

4

5                         **INDEX OF EXHIBITS**

6     **EXHIBIT**              **DESCRIPTION**          **Id'D**       **Rcv'd**

7     No exhibits identified or received.

8

9                         **MISCELLANEOUS INDEX**

10                                         **PAGE**

11    No miscellaneous index entries.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           COURTROOM DEPUTY:  *United States of America versus*
2  *Joseph Diekemper*, Case Number 08-30139-01-GPM, is called for
3  sentencing.

4           Will the parties identify themselves for the record?
5           *MS. HUDSON:*  Jennifer Hudson appearing for the United
6  States.  Good morning, your Honor.

7           *THE COURT:*  Ms. Hudson, good morning.
8           *MR. SISON:*  Gil Sison on behalf of the defendant
9  Joseph Diekemper.  Good morning, Your Honor.

10           *THE COURT:*  Mr. Sison, good morning.

11           We are here for the sentencing of Joseph Diekemper.  I
12  do note that earlier, the defendant did enter a plea of guilty
13  to the charges.  The magistrate judge made a report and
14  recommendation that I accept the guilty plea.  I acknowledged
15  the report and recommendation, but withheld my decision.

16           I've had a chance to look at all the papers in this
17  case and considered the matter.  And having done so, at this
18  time I find that the defendant is guilty.  In other words, I
19  accept the report and recommendation and adjudge the defendant
20  guilty, accordingly.

21           Of course, then what happened in the ordinary course
22  of business, the probation department prepared the usual, very
23  detailed, written presentence investigation report.  And it was
24  provided to both sides for consideration, as well as the Court.

25           Now, probation determined that here we have a total

1    offense level of 30, with a criminal history category of 1.

2    Under Counts 1, 19, and 21, I think we have a -- it maxes out

3    at five years, but under Count 2, it maxes out at 20 years.

4    And under Count 2, a guideline sentence would be 97 to 121

5    months.

6          A guideline supervised release would be two to three

7    years.  The defendant is not eligible for probation.  And a

8    guideline fine would be 15,000 to $5,519,900.  Restitution is

9    not an issue.  There is a special assessment of a hundred

10   dollars.

11         I've also --

12         COURTROOM DEPUTY:  On each count, I'm sorry, on each

13   count.

14         THE COURT:  The special assessment is a hundred

15   dollars on each count.  Three counts.

16         COURTROOM DEPUTY:  There is four.

17         THE COURT:  Let me see.

18         COURTROOM DEPUTY:  One, 2, 19, and 21.

19         THE COURT:  You are right.  Thank you.

20         Now I've received a host of letters, running both

21   ways, from family members, friends, and others.  I also have a

22   letter from the defendant to United States Congressman, and

23   it's largely complaining about the guidelines, but it's -- I

24   don't think the defendant is illiterate, but it is largely

25   unintelligible.  So for whatever it's worth, the Court can't

1    discern that.  It just -- it's just -- seems the rambling of

2    someone who has trouble writing, which is not a crime.

3          Now, the -- we have a combination here of --

4    principally of mail fraud and bankruptcy fraud.  The sentence

5    for mail fraud is, oddly enough, potentially higher than for

6    bankruptcy fraud.  The two have to be considered together.  And

7    this presents some unique sentencing considerations.  Now, I've

8    read all the papers in this case, and I'm going to let the

9    parties address those.  But let me make some preliminary

10   thoughts here so we are all on the same page.

11         There are some objections that truly are guideline

12   objections.  They have to do with the intricacies of guideline

13   sentencing itself.  I always think of it in terms of working

14   out a geometry problem.  You get the premises and the theory

15   and the theorems right, you are going to come out with the

16   right answer most of the time.

17         But because the guidelines are now only advisory, it

18   is largely an exercise in making sure that we've given due

19   respect to the guidelines.

20         Now, in this case -- in this case, there is an

21   objection, generally, to the amount of the loss.  And what I'm

22   wondering here Mr. Sison is, are you trying to look at this as

23   truly a guideline matter, or instead, is this a factor under

24   the sentencing statute?

25         Here's my thinking on this:  It looks to me like

1    what's happened here is that shortly before filing bankruptcy,

2    the defendant had filed a financial statement, and within a

3    matter of months, he had filed bankruptcy.  And the government

4    has looked at the difference between the two and say it is a

5    fraudulent bankruptcy.  Now, I suppose it could be argued that,

6    well, the financial statement was just puff.  Of course, then

7    that would be mail fraud, I suppose.  You are kind of caught

8    either direction.

9          So it seems to me, unless there's going to be

10   something I don't see, that the amount of the loss was properly

11   calculated, although you may want to argue that.

12         Also, it looks to me like a technical -- as a

13   technical matter, he was a leader and organizer.  You could

14   find five other participants.

15         So what I want to know from you first is:  What is it

16   that you want me to take a look at or what are your objections

17   that go to guideline sentencing, specifically?  And then we can

18   get to arguing what a proper sentencing ought to be under the

19   statute.

20         And now would be a good time for me to make it clear

21   on the record, the Court is fully apprized of the Supreme Court

22   jurisprudence on guideline sentencing, including the latest

23   *Spears* case.  I understand that I am not bound by the

24   guidelines, that I can consider everything that goes to a

25   sentencing.  As you say in your papers, even the matter of

1   recidivism, age, all of these matters the Court can consider.

2   So while I am going to calculate a guideline sentence here, the

3   Court fully understands the discretion that I have.

4           Now with that said, what guideline objections do you

5   wish to make today?

6           *MR. SISON:*  Your Honor, we made an initial objection

7   to the loss amounts, your Honor, because we thought we could

8   find an alternative theory on loss.  We were aware of Seventh

9   Circuit case law that would indicate that the loss amount was

10  determined by intended loss which we based on papers.  We were

11  looking to research, for example, whether the loss amount

12  dealing with the loss that was incurred to the bankruptcy

13  court, all the procedures of the bankruptcy court, all the

14  expenses that would be incurred with that, that would be a

15  possible alternative basis for loss.

16          Unfortunately, based on our research, we have not been

17  able to come up with any definitive cases that would call into

18  question current existing Seventh Circuit case law.  As such,

19  we are willing to withdraw our objections on bankruptcy loss.

20          And the only objections we are willing to proceed on,

21  we are willing to proceed on argument alone, if need be, is the

22  application of the four-level leadership enhancement.  We

23  believe that the application of the two-level enhancement is

24  appropriate, not the four level.

25          *THE COURT:*  All right.  Now before we proceed to that

1    argument, Ms. Hudson, what is your position on the two- as

2    opposed to the four-level enhancement?

3         *MS. HUDSON:*  Your Honor, I believe that the probation

4    department has it correctly, that there are a combination of

5    five or more participants and others.  And that it is an

6    otherwise extensive enterprise that the defendant was in charge

7    of, and we wish to proceed with argument to support that.

8         Thank you.

9         *THE COURT:*  Certainly.

10        Now, what is the basis for your objection to the

11   four-level enhancement?

12        *MR. SISON:*  Well, your Honor, first of all, I mean,

13   there's only two ways you can get Mr. Diekemper on a four-level

14   enhancement.  Either you would have five or more criminally

15   responsible participants or the -- or the scheme itself has to

16   be otherwise extensive.

17        With respect to the five or more criminal

18   participants, we do not believe the government can meet that

19   burden, because under the case law as it stands, criminally

20   responsible participants have to be criminally responsible.

21   You have to know what you are doing is illegal.  And if you

22   look at the statements, for example, with respect to Mr. Ennen,

23   Mr. Raetz, Ms. Hempen and Mr. Kampwerth, those statements do

24   not indicate any criminal responsibility on their part.  For

25   example, Mr. Raetz indicates in his statement that he didn't

1   even know that Mr. Diekemper was in bankruptcy at the time.  Or

2   he said that he thought his bankruptcy had concluded.

3        With respect to Ms. Hempen, who is alleged that

4   Mr. Diekemper asked her to lie for him, there is nothing in the

5   report that would indicate that she actually agreed to lie

6   about any testimony.  She actually said in her report that I

7   felt uncomfortable about him asking me to lie for him.  But she

8   ended up not being called as a witness, and she didn't end up

9   being used as a witness -- she didn't end up being used as a

10  witness.  So the question remains was she -- did she agree to

11  actually lie for him?  If she did, I would agree that she is

12  criminally responsible.

13       *THE COURT:*  So as between two, your theory of defense

14  goes to the first, that is to say, there are not five --

15       *MR. SISON:*  That's correct.

16       *THE COURT:*  -- criminally culpable participants.

17       *MR. SISON:*  That's correct.

18       I would agree that Mr. Diekemper is a participant, his

19  wife is a participant, and probably Marvin Kampwerth is a

20  participant, those three.  Because Mr. Kampwerth agreed to lie

21  for Mr. Diekemper about the $100,000 loan.

22       But the other remaining participants, I do not believe

23  there is sufficient evidence to bind them as criminally

24  responsible.

25       If you agree with us on that point, the other analysis

1    comes down to whether or not this is otherwise extensive.  And

2    the case law that I've researched from the Seventh Circuit is

3    if you are going to rely on a head count, in other words, the

4    Seventh Circuit has concluded that, yes, you can rely on a

5    combination of five or more participants of both criminally

6    responsible participants and outsiders, but other factors have

7    to be included.

8            So the two cases that I would like to refer this Court

9    to, the first is *United States versus Randy* 81 F.3d 65.  It is

10   a Seventh Circuit case from 1996.  It discussed specifically

11   the meaning of extensive.  And it noted that there were at

12   least six participants, two who were criminally responsible,

13   four of which were just outsiders, but it noted the other

14   factors, including, for example, that there were 60 brokers who

15   sold $60 million worth of false certificates, that over 400

16   investors were bilked.  So clearly, there were other factors

17   involved that warranted the otherwise-extensive finding.

18           The reading of the statute has to be that you either

19   organize five or more criminal participants, or it's otherwise

20   extensive.  So to have the otherwise extensive have any meaning

21   whatsoever, it has to be not only the five or more criminal

22   participants equal the number, but there should be other

23   aggravating factors that would counsel for a finding of

24   otherwise extensive.

25           There is another case that I would refer the Court to

1    and that is *United States versus Austin* and that cite is   54

2    F.3d 394.   It is a Seventh Circuit case from 1995.   And it did

3    there acknowledge -- basically, it reversed the district court

4    and it remanded to the district court for a finding as to

5    whether there would be -- whether the statute met the otherwise

6    extensive prong.   But it noted that the head count was

7    sufficient, as long as there were other extensive extenuating

8    factors.   And it noted that, in this case, there were -- this

9    was dealing with an art fraud case -- that the defendant had

10   over 30 galleries and hundreds of employees working at his

11   disposal to help him to defraud the public.   And it sort of

12   implicated indicta that that was sufficient to warrant a

13   finding of what's extensive.

14        So here, your Honor, I think that while the

15   participant number, the head count might be satisfied, the

16   otherwise extensive nature I think would fall below the

17   threshold that other Seventh Circuit cases have found when

18   dealing with the otherwise extensive part.

19        *THE COURT:*  Thank you.

20        Ms. Hudson, so I know, as I understand your argument,

21   are you going under the simple rung, the first rung, which you

22   have five or more criminally culpable participants or are you

23   opting for the second rung where, well, maybe they're not all

24   criminally culpable, but the fraud is extensive?

25        *MS. HUDSON:*  Under the second rung, your Honor.

1      THE COURT:  Okay.  Very well.  I'll let you proceed as
2  you will.  I think having made the objection, it's now on the
3  government by a preponderance of the evidence to sustain the
4  calculation.
5      MS. HUDSON:  Okay.  Your Honor.  Thank you.
6      I would like to proceed by proffer at this point
7  unless the Court has any further questions.
8      THE COURT:  Certainly.
9      MS. HUDSON:  The Court has considered in front of it
10  the presentence report.  We also have the statements by counsel
11  that we have three participants, as well as others.  And my
12  understanding of an "other" or an "outsider" is described as a
13  person who unknowingly helped the organizer or leader of the
14  criminal activity.
15      What we have in this instance is an individual who was
16  a farmer who filed for bankruptcy.  He was allowed to be a
17  debtor in possession of that farm.  It was a dairy farm.  What
18  he did from that point on was engage in one continuous act of
19  fraud after another.
20      The bankruptcy judge, sitting in a position of
21  authority, telling him what to do, had no idea what was going
22  on.  Starting at the very beginning when Mr. Diekemper was told
23  you have to submit monthly reports based on your bank account,
24  and the Court found that those were not done correctly, the
25  defendant was given the benefit of the doubt and told hire an

1    accountant and that way you can get your reports in correctly.

2         Then it came to light that the accountant,

3    Mr. Holcomb, was receiving bad information from the defendant.

4    Not included in those reports were transactions that he made to

5    sell equipment outside of the bankruptcy realm, that he

6    received payment for that.  That he was making cash

7    transactions with other individuals that did not go through his

8    bank account.  That he was taking out $5,000, not in line with

9    what he was told to do with the bankruptcy itself.  That he had

10   a phony $100,000 loan through Marvin Kampwerth, and that he

11   pretended to pay back this loan using falsified documents that

12   he said, here, this is what I paid him back, when in fact, none

13   of that happened.

14        *THE COURT:*  Now, Kampwerth is the --

15        *MS. HUDSON:*  Is a participant.

16        *THE COURT:*  -- who the defendant concedes is a

17   participant?

18        *MS. HUDSON:*  Right.

19        But the fraud is ongoing with not just that fraudulent

20   loan.  He's making up these statements, presenting them to the

21   Court.  In addition to Mr. Kampwerth getting up in front of the

22   Court and under oath stating that this is a valid loan, the

23   defendant got up under oath and said this is a valid loan or

24   series of loans.  It was not just the filing of it in front of

25   the Court, but the ongoing proceeds where he was deceiving the

1    accountant, deceiving the Court.

2         And then you have another time where, again, this

3    accountant, he is taking 100 some trips to various casinos,

4    losing over a hundred thousand dollars.  When he does win, that

5    money does not go into the bankruptcy.  When he loses, he is

6    supposed to give an accounting of that.  The whole goal is to

7    put him on track so he can save the farm.  He doesn't do that.

8    He doesn't disclose anything to anybody.

9         So then you have the participant -- then you have him

10   taking this over to -- some of the money over to a Ford

11   dealership, buying a truck.  His wife then testifies about it

12   in court.  She's now a participant.  She's lied under oath.

13   Then you have him titling that in his daughter's name.  She has

14   no idea that this is happening, but he has now hidden assets in

15   her name.

16        He also takes other assets and transfers them to other

17   people's names.  And we have a whole host of people in the

18   farming community around him where he starts hiding property,

19   including the Weedans, including Mr. Raetz, and the other

20   Kampwerths, not the one we have spoken of.

21        Extensive hardly puts the right phrase into it.  When

22   you are dealing with something seemingly as simple as a

23   bankruptcy, this man has gone through everything he possibly

24   can to make sure that nobody knows where anything is.

25   Therefore, I believe that his actions are extensive, that he

1    certainly is orchestrating this.  He is the leader and he is

2    the one pulling the strings, almost like a puppeteer.  We

3    believe that the probation department is correct in their

4    assessment.

5         THE COURT:  Mr. Sison, would you like a brief argument

6    on that?

7         MR. SISON:  Yes, briefly, your Honor.

8         First of all, we concede that he was an organizer,

9    leader, and manager.  I mean, there's no question that he did

10   that.  There's no question that he orchestrated these

11   activities.  You know, but the question is, you know, a lot of

12   the things that my learned colleague mentioned were covered by

13   the offense conduct themself.  For instance, the loan to Marvin

14   Kampwerth, that is -- that's also -- that's accounted for in

15   the guidelines and already accounted for in the offense

16   conduct.  And the passage of false title -- the false vehicle

17   title from him to his daughter, that's accounted for in the

18   mail fraud.

19        The purpose of these guideline enhancements are

20   simple.  They are to account for activities and factors that

21   the offense itself that he has pled to does not account for.

22   And so we think that, you know, I -- granted, I know that

23   takes -- it's part and parcel of the otherwise extensive prong,

24   but to rely on that primarily as a basis to enhance him on the

25   four-level enhancement, we believe is inappropriate.  We

1    believe the two-level enhancement is the most appropriate

2    enhancement to add, given facts of this case.

3          *THE COURT:*  All right.  Thank you.

4          I think the arguments here really clarify the issue

5    here, and the government's argument goes to the second prong of

6    the provision that would enhance four levels rather than two.

7    That is to say, you have the number of participants.  That's

8    clearly here.  Granted, all of them might not be criminally

9    culpable, the government doesn't press the point that they are.

10   But instead, focuses on the question of whether this is

11   extensive.

12         The Court finds that the government has sustained its

13   burden of proof.  This is extensive.  There is no question

14   about it.  It was -- it was orchestrated, it was over an

15   extended period of time, and it involves, what was at least

16   nominally, a lot of money.

17         This wasn't the case where the defendant on one or two

18   occasions misstated something to the bankruptcy judge.

19   Instead, there was a very extensive pattern that persisted over

20   time and that involved a lot of other people.  A lot of thought

21   and effort went into committing this fraud.

22         Now as to the question that there might be double

23   counting, it seems to me that the guidelines take that into

24   account and authorize the very enhancement here on top of what

25   we already have.  I don't think that's truly double counting.

1        But at any rate, the argument here is not, it seems to

2   the Court -- while I recognize there is an argument, but the

3   better argument is what is an appropriate sentence under the

4   sentencing statute.

5        So the Court then adopts the probation officer's

6   recommended findings of fact.  And I also conclude that

7   probation correctly calculated what would be an appropriate

8   guideline sentence.  So the total offense level here is indeed

9   30.  And the criminal history category here is one.  So an

10  effective guideline sentence would be 97 to 121 months.

11  Keeping in mind that on Counts 1, 19, and 21, the statute

12  itself caps the offense at 60 months, or five years.  So with

13  Count 2, the maximum statutory sentence is 20 years, but the

14  guideline sentence is 97 to 121 months.

15       All of my other statements also remain in effect.

16  That is a fine of 15,000 to $5,519,900.  There is no

17  restitution here.  There is a special assessment of a hundred

18  dollars on each count.  That would be $400.

19       Now Ms. Hudson, what is the government recommending in

20  this case and why?

21       MS. HUDSON:  All right.  Your Honor, the government is

22  recommending a sentence of 121 months.  We are recommending

23  three years of supervised release.  We are not asking for any

24  fine in this instance.

25       The reasons are these:  This defendant recognizes no

1    authority other than himself.  This is not an instance where we

2    have an individual farmer who is unsophisticated and not used

3    to the criminal or bankruptcy courts.  While he may not have

4    any prior experience there, he's very adept at playing the

5    system.

6         It started out, as I mentioned earlier, with those

7    accountings that had to be made to the bankruptcy court.  At

8    first everyone thought he is unsophisticated, let's give him an

9    accountant to help out.  But the old phrase, garbage in,

10   garbage out, he is not providing the detail that goes into it.

11        He's purposefully selling grain, he's purposefully

12   selling milk, getting hay, all these things without accounting

13   for it to the bankruptcy court.  He is selling property without

14   letting the bankruptcy court know it.

15        He tells the bankruptcy court that he was told by one

16   of the prior, now deceased, individuals at -- I believe it was

17   Century Bank or its predecessor, that this person said go ahead

18   and hide all that so the bankruptcy court doesn't find out

19   about it.

20        Then we have the whole issue of the mailings that were

21   involved in this.  I understand the Court stated that this

22   seems to be a bankruptcy fraud with an incidental mailing.

23   What you have when this individual takes his items to auction,

24   there are mailings about, this is what you have sold, this is

25   how much it is, here are your checks, and then there are the

1   titles that he sends mailings back and forth with the Illinois

2   state agency which licenses and titles and taxes vehicles.

3           It's not just incidental to, but it is part of the

4   bigger scheme.  He could have committed a bankruptcy fraud

5   without committing the mail fraud.  He could have committed a

6   bankruptcy fraud without getting on the stand and perjuring

7   himself.  He could have committed a bankruptcy fraud without

8   pulling his wife into it.  He could have committed a bankruptcy

9   fraud without pulling friend into it and getting his friend now

10  convicted and awaiting sentencing before Judge Herndon.

11          His activity shows he has no regard for his wife, for

12  her well-being, for the fact that she faced imprisonment, for

13  his friend, for any of the individuals who hid property for

14  him, who could also have been in trouble with civil or criminal

15  authorities.

16          When we get in front of Judge Proud and he's told to

17  turnover the weapons, then there is a big disappearance act.

18  He indicates that those weapons are given to his son.  His son

19  says no they're not.  He comes back and says, oh, I gave them

20  to this other guy.  The other guy said, no, I told him to get

21  it off my property.  And this past week they're found hidden in

22  the woods.

23          *THE COURT:*  Tell me about that.

24          *MS. HUDSON:*  There was an individual who went mushroom

25  picking, who stumbled across some weapons on Mr. Gunsenberger's

1    property.  Called the police.  That individual and

2    Mr. Gunsenberger were interviewed.  None of them -- or neither

3    of them had any ideas that these weapons were located.  There

4    were a large number of them, several of them.  The one missing

5    is the .22, which the defendant stated he originally was going

6    to give to law enforcement.

7         This defendant has no regard for anybody other than

8    himself.  All he wants are those weapons to be stored, not to

9    give them to the proper authorities.  Doesn't have any regard

10   to this Court or Judge Proud or the bankruptcy judge.  Based

11   upon his ongoing actions, his ongoing deceit, we believe that

12   this individual is distinguishable from other individuals who

13   come before this Court.

14        *THE COURT:*  Let me ask you this:  In spite of all

15   this, you are asking for a guideline sentence?

16        *MS. HUDSON:*  Yes.

17        *THE COURT:*  The Court is authorized to give this man

18   20 years.

19        *MS. HUDSON:*  The Court can.

20        *THE COURT:*  Is there something -- some reason for your

21   reticence in this case?  Is that your plea agreement or?

22        *MS. HUDSON:*  It's not in the plea agreement.  I

23   believe that the Court could, under the 3553(a) factors, go all

24   the way up to the 20 years.  I think that in a matter of

25   fairness, that the high number at this point is appropriate.

1    But I do think that if the Court were to find those 3553(a)

2    factors existed --

3              THE COURT:  Sure.

4              MS. HUDSON:  -- that, yes, it is.

5              THE COURT:  I am aware of my discretion.  I'm just

6    curious as to what your position is on the case.

7              MS. HUDSON:  On the interest of fairness, I think the

8    high number and three years of supervised release is

9    appropriate.

10              THE COURT:  All right.  Now -- thank you.

11              MS. HUDSON:  Thank you, your Honor.

12              THE COURT:  Mr. Sison, do you wish to put on any

13    evidence before you make your argument?

14              MR. SISON:  No, I do not, your Honor.  And if the

15    Court would indulge me.

16              THE COURT:  Of course, I will.

17              MR. SISON:  I'd like to proceed a little bit out of

18    order.  I'd like for Mr. Diekemper to make his statement if the

19    Court would permit.

20              THE COURT:  I will have him speak into the mic where I

21    can hear him.

22              Mr. Diekemper, this is your opportunity to speak.  Now

23    speak where I can hear you.  Just speak into the mic.

24              MR. SISON:  Do you want us at the podium?

25              THE COURT:  No.  But as long as I can hear him, I'm

1   okay with him.

2        MR. DIEKEMPER:  I, Joe Diekemper, a dairy farmer that

3   lost everything was selfish and conceited.  I had a lot of time

4   to think about what I'm going to say.  But by being overbearing

5   and ignorant, I prayed on my family, my friends, and my

6   neighbors.  A few things from bad advice, but that was no

7   excuse for the wrong I've done.  I deserve to be punished,

8   because at the end, I was selfish and did not realize the

9   effect my actions would have on me and others.

10        My grandpa made a statement that I believed in all my

11  life was that I should trust and believe, one, my spouse; two

12  my priest; three, my banker; and four, my lawyer.  And you

13  would make it if you believed in them.

14        All I've ever wanted for myself was to be a farmer and

15  have a family that loved me and give them a good life and put

16  them on the right path.

17        I look back on what I have done, and I am completely

18  disgusted with myself.  I have lied and cheated to save my

19  farm.  I realize a little too late that my son's memory will

20  always be with me and feeling responsible and trying to carry

21  on his dreams is no excuse for the lying and cheating.

22        I am not a failure because I lost my farm, like I

23  thought.  I'm a failure because I betrayed the love and faith

24  of my family and my friends.

25        I forever have to deal with everyone calling me a

1    cheat and a liar for the rest of my life and I deserve it.  And

2    I take full responsibility for my actions.

3            Your Honor, I regret the most is dragging the ones I

4    love into the mess to cover my ignorance and wrongdoing.  My

5    wife is the best thing that ever happened to me.  She's my

6    first and only love, and she is a saint and would do anything

7    for me.  I took advantage of her and she listened.

8            Your Honor, my overbearing ignorance of taking advice

9    is no excuse, and I am totally responsible.  Even though the --

10   they are getting sued for wrongful advice, I am guilty.  I've

11   committed a crime.  My wife didn't deserve this and now she's a

12   convicted felon.

13           Despite all of this, she stuck with me and visited me

14   every week.  And she said she forgives me.  Her not having any

15   contact with me and visits is the worst punishment I could ever

16   receive.  After almost 37 years of marriage, which our

17   anniversary is tomorrow -- and also our daughter's birthday --

18   my love will always be there.  I can only hope and pray that

19   after I finish my sentence and my health is good enough, that

20   she will still be there for me.  I pray every day for this, but

21   I don't deserve her.  All I can say to her is that I love her

22   and I'm truly sorry, and I wish she was here today so I could

23   tell her that in person.

24           I've already lost one son and having two other

25   children not talking to me for my foolishness and selfish

1   actions is almost too much to bear.  If they can hear me now,

2   all I can say to them is I'm sorry that I failed and let them

3   down.  I know they are ashamed and embarrassed of me, and I

4   don't blame them for not wanting anything do with me.

5          Your Honor, I not only lost three of my children, I

6   lost my grandchildren, too.  I cry every day thinking of them.

7   I realize what I did and all I can hope and pray that one day,

8   they can find it in their heart to forgive me before it's too

9   late and I'm gone.  And maybe we have a chance to become a

10  family again.  I wish I could tell them I'm sorry to their

11  face.

12         As for my friends, I also took advantage of their

13  faith and loyalty in me and dragged them into my mess and

14  criminal actions that I did, which could have got them into

15  criminal trouble.

16         My lawyer showed me a letter from a friend, Barb and

17  Dave Hempen.  I was surprised to receive a letter from them.  I

18  knew them my entire life.  They were dear friends, but my

19  actions in asking them to do things, I didn't think and don't

20  deserve their support for me in the time of need.  To Barb and

21  Dave and all the others who supported me and believed in me and

22  trusted me in any way, I thank you, and I'm very sorry I took

23  advantage of our friendship.  And hope and pray that you will

24  find it in your heart to forgive me.

25         While I'm standing here waiting for my punishment, I

1    look back and see my wrongdoing and my actions, resulting in a

2    loss of more than a person can ever overcome.  Losing my

3    family, my friends and my livelihood.  It is very true that you

4    don't realize what you have until you lost it.  I had the most

5    expensive treasure that anybody could have, that was my family

6    and friends that loved and had faith in me, and I foolishly

7    threw it away.

8         My four children aren't the only things that my wife

9    got from me.  She has three great-grandchildren that we both

10   love.  Our love for almost 37 years through hardships and

11   criticisms, we gave our kids a good college education and

12   learned them to believe in God, and we hope we put them on the

13   right path.  And I love them no matter what.  I will always try

14   to gain their love and become their father and their grandpa

15   again.

16        Unfortunately, I realized too late my life is not

17   measured by money or the loss of my farm, but the love of my

18   family and friends that stuck with me through thick and thin.

19   With the short time I have left, I pray I can get a second

20   chance and restore the love and faith with my family and

21   friends that I once had in me before it's too late.

22        My wrongdoing and selfishness, I ask for forgiveness

23   and I'm very sorry to all I hurt.  And please, give me another

24   chance.

25        God forgives us all and God has let no man -- said let

1    no man separate what he put together, and my selfishness and

2    wrongdoing lead to that.  If I ever meet my parents or my son

3    in heaven, I would be so ashamed of my actions.  I pray that I

4    could get forgiveness from them for my crimes.

5          I have done wrong and am ready to take my

6    responsibilities.  I apologize to you, your Honor, to the

7    prosecutor, to my counsel, my friends, my family, for my

8    crimes.  God forgive me.

9          Thank you, your Honor, for hearing me out.

10         *THE COURT:*  All right.

11         Now, Mr. Sison, what are you recommending here and

12   why?

13         *MR. SISON:*  Your Honor, may I approach the podium?

14         *THE COURT:*  Yes, wherever you are comfortable.

15         *MR. SISON:*  Well, your Honor, I guess the question is

16   to be, how do you judge a man?  Do you judge him by his last

17   act?  Because if he is, if we are going to judge him by his

18   last act, he's going to be in a whole lot of hurt.

19         But I don't think we should judge him by his last act.

20   I think we should take into account his entire life before we

21   pass judgment on him.  Because in the end, justice is not just

22   about meting punishment, it's about mercy and compassion as

23   well.

24         Now, in my sentencing memorandum, your Honor, I asked

25   for a 60-month sentence, which is the max on the three counts,

1    the Counts 1, 19, and 21, as an appropriate guideline sentence.

2    And the reason we ask for that, primarily, is because we

3    believe that the seriousness of the offense and the just

4    punishment for the offense warrants a significant time of

5    incarceration.  There is no question about that.

6          He's accepted responsibility.  He's acknowledged the

7    hurt he's caused to others, and he deserves time in prison.

8    But the question is, how much time in prison does he deserve?

9          And so if I might add, before I go into legal

10   arguments regarding what I believe is appropriate for

11   Mr. Diekemper, you know, I'd like to take you back a little bit

12   to flesh out some of the story behind what actually happened

13   with him and how he got to where he got to.

14         I mean, your Honor, this man has been a farmer all his

15   life.  His parents were farmers, he lived on that farm.  It

16   was, you know, and it was his mother's father's, and he lost it

17   because of this bankruptcy.  You know, he started off always

18   with a chip on his shoulder, so to speak, always feeling that

19   he had to prove something to others because he wasn't really

20   given the chance.  If you note in the presentence report, his

21   father was very cruel to him.  You know, he was subject to

22   physical and verbal abuse, and he also felt that he was always

23   the second child, so to speak.  You know, not always the

24   favored one.

25         Unfortunately, how that worked out, as fate put it, he

1    was the one that was put in charge of the farm when his father

2    went ill and he was successful at it.  He was very successful

3    at it.

4           If you look at all the letters, if you look at

5    everyone that has filed in support, you know, while you have a

6    dichotomy between a Mr. Diekemper that's lied and cheated, I

7    can show you a Mr. Diekemper that has given his time and his

8    energies to his community incessantly.  For example, he

9    willingly gave his farm as part of a high school sponsorship

10   program so high school kids and Future Farmers of America could

11   learn how to farm.  He willingly gave that to the school,

12   without anybody asking of it, because he believed that, you

13   know, hard work -- you gain through hard work.  He believed --

14   as a farmer, he believed that farming was a valuable thing in

15   life.

16          You know, he also -- if you look at the letters, he

17   also stood by his friends in time of need.  I recall a letter

18   from Mr. Dave Jansen, who owns a business in Carlyle, and when

19   his business burnt down, Mr. Diekemper was there to help clean

20   it up.  Mr. Diekemper was there to help him get back on his

21   feet.  Mr. Jansen also noted that he can use Mr. Diekemper's

22   property whenever he wants and his farm equipment to demo

23   equipment.  He never asked for anything in return.  This is the

24   Mr. Diekemper that I want this Court to see, in addition to

25   what he -- what you see with respect to the offense committed.

1        And you look at other instances where he is, you know,

2   given scholarships to local high schools, memorials that were

3   set up with respect to his son's death.  And you look at a man

4   who has, for 61 years of his life, led the good life.

5        You know, and you wonder, so what made him do all

6   this?  I mean, there's nothing in his background that would

7   indicate any sociopathic tendencies that would end up resulting

8   in the crime he committed.  There's nothing -- he never had

9   an -- two traffic tickets, so to speak.  I think that was it.

10  This really is his first true -- first true involvement with

11  the criminal justice system or any justice system whatsoever.

12       But the reality of it is that, you know, you look back

13  and you look back at what could have made him do what he did.

14  I don't know for certain, I guess we will never know for

15  certain, you know.  But, you know, this is a man who lost his

16  son in 1999 in one of the most tragic farm accidents in

17  Illinois history.

18       THE COURT:  You know, I've thought about that, but of

19  course it occurs to me, too, that couldn't it -- it couldn't

20  have affected him any more than it affected his wife.

21       MR. SISON:  I would agree with that, your Honor.

22       THE COURT:  Or his other children.  And you know, the

23  wife, certainly, she wouldn't have even had a parking ticket

24  but for him.  All she had done is just bent to his will her

25  entire life.

1        *MR. SISON:*  I understand that, your Honor.

2        *THE COURT:*  And I'm just -- I just think, being a

3   father and a grandfather, too, you know, the -- with the women

4   and the way that we've recognized them as individuals with

5   power and right, what would have happened when a woman is

6   brought up in the current society, she would have either shot

7   him or turned him into the police, and he would have been saved

8   and society would have been saved what we are going through

9   right now, correct?

10       *MR. SISON:*  I would agree with that.

11       *THE COURT:*  We can't judge her because she didn't grow

12  up in that time or that place.  She actually thought in her

13  mind that she had to pay attention to this man and listen to

14  him and take him seriously, although she had to know at some

15  level everything he just told us.

16       *MR. SISON:*  And I agree with that, your Honor.

17       *THE COURT:*  Okay.

18       *MR. SISON:*  I'm not using this as an excuse, by any

19  stretch of the imagination, your Honor.  It is not an excuse

20  for his conduct.  This simply provides context for the conduct.

21  It's not an excuse.

22       *THE COURT:*  It's entered my mind.  I'm sure we have to

23  deal with it.

24       *MR. SISON:*  And you should know something, too, your

25  Honor, this is something that's not in the presentence reports,

1    but, you know, in dealing in my conversations with the family

2    and throughout the course of this investigation that our firm

3    has done, that when his son died, he wanted to give up that

4    farm.  He did.  You know, he didn't want anything do with it.

5    It was too painful of a memory, you know.  And what happened

6    though was this thing where, you know, Troy, when he was 15,

7    had a lot of friends in school, and they would always come over

8    on the anniversary of the death and always come over regularly.

9    These friends of Troy were like Joe's kids.  You know, and

10   that, I think, was a big reason why he continued to support the

11   FFA and a big reason why he continued to support the school.

12        And if I might surmise a little bit, I think when he

13   saw it eventually -- you have to understand the timeline here a

14   little bit because there was a wrongful death suit with respect

15   to this accident.  And they didn't get that money until 2003.

16   They got a significant amount of money out of that wrongful

17   death settlement.  So from 1999 to 2003, they really

18   considered -- they were just getting by and they really

19   considered shutting that farm down.

20        You know, but I think through the -- through his

21   friends, through Troy's friends, and the fact that they wanted

22   some sort of lasting memorial for him, perhaps that's why they

23   continued to do what they did.

24        And I will tell you this much, your Honor, the vast

25   supermajority of this settlement that they got in the wrongful

1   death was put entirely in the farm.  They could have taken that

2   money, in their twilight years, and they could have retired,

3   lived comfortably off that money, but they didn't do that.

4   They probably did a foolish thing, financially, in my opinion,

5   but they sunk it all in the farm.  And they expanded too fast.

6   And when they expanded too fast, they couldn't cover their

7   expenses, which lead to the bankruptcy itself.

8           I'm not excusing what he did.  There's no way.  What

9   he did was -- as he says, quite disgusting.  He took advantage

10  of his friends, he took advantage of his family.  You know, but

11  if I might posture -- if I might posture a reason for why he

12  did what he did -- I'm not saying it's right, I'm not saying

13  it's rational, I'm not saying it's reasonable -- but in his

14  mind, you know, losing that farm could have, to him, meant

15  losing his son again.  Maybe that's why he struggled so hard

16  and did all the bad things that he did to try to stay afloat.

17  Again, not justifying what he did.  There is no question.  It's

18  just providing context to the offense.  He knows what he did

19  was wrong.

20          *THE COURT:*  Let me ask you this:  I don't think it's a

21  secret, nor would I wish it to be, but I just have -- I just

22  hold your law firm in the highest esteem.  You are in here on a

23  regular basis, I take your arguments seriously.  And I know

24  whether you will tell me so or not.  I know that you told your

25  client to cough up those guns that were only found last week.

1    Now you are not making the statement here, you are not under

2    oath, but I know that.  And I don't understand why it is that

3    at this late point, that law enforcement, the United States

4    Marshals and the rest, have to go out and find these buried

5    guns.  It just seems to the Court that there can be no possible

6    explanation for that.

7         MR. SISON:  First of all, let me address that point.

8    I was faxed those pictures and the statement from this

9    cooperating witness last night.  Actually, I didn't get into

10   the office until early this morning.  And today was the first

11   that I'd seen it.

12        And I can tell you -- let me backtrack a little bit

13   about that history, because we were here before the motion to

14   revoke -- on our motion to revoke the magistrate's detention

15   order.  We made the argument that we believed -- that we

16   believed that -- that Judge Proud's decision was incorrect

17   pursuant to 18 USC 3148, and as such, we were asking this Court

18   for a de novo review.  And that's when we got hit with the

19   statement and the first time that I had seen it, the statement

20   from Mr. Weedan.  We know that Mr. Weedan had been asked to

21   hide the tractor and he was afraid that, you know, he was

22   afraid of Mr. Diekemper, so to speak.

23        So -- and I don't know where -- how this issue got

24   involved in this.  All I can tell so this, is that, you know, I

25   mean, I put up a good faith argument on that motion to

1    revoke --

2         *THE COURT:*  I'm not questioning your good faith or law

3    firm's good faith.  As a matter of fact, I'm endorsing it.  I'm

4    just saying, the Court can't come to grips with the reality

5    that at this late date this defendant is not coughing up what

6    he was absolutely obligated to cough up.  And moreover, I'm

7    satisfied that he was properly counseled as to the absolute

8    necessity to come clean with all this.

9         *MR. SISON:*  And he was.  And my position on that is

10   that, you know -- my client's position was that he had given

11   those guns to Gunsenberger, or whatnot.  And they had the

12   opportunity to seize those weapons.

13        As a matter of fact, if you look at the timeline

14   closely, there was a time period from January to July of '08

15   that the FBI knew the guns were in his possession, yet they did

16   not come to him, didn't come to speak with him.  I did not have

17   one contact with the FBI asking me for those specific weapons,

18   not one.

19        *THE COURT:*  You didn't know where they were.  We would

20   have had them already.

21        Are you saying the defendant didn't know?

22        *MR. SISON:*  Your Honor, all I can tell you is -- all I

23   can tell you this is getting in this notion of this Weedan

24   thing.  And which is unfortunate, because if we just read all

25   the press accounts, he's been convicted of that murder.

1          THE COURT:  I'm not even considering that.  I don't

2    know how this ties into the murder, if at all.  That's not my

3    concern.  I'm not about to consider that.  If the government

4    thought they had a case, I assume they would charge him.

5          MR. SISON:  And I would agree.

6          THE COURT:  And I'm not going to consider that.  I'm

7    just saying that, from the Court, I've heard this very moving

8    statement, but why weren't -- why wasn't law enforcement and

9    the Court informed, look, you know, I know where these guns

10   are, go get these guns.  I mean, in other words, let's quit

11   trying to game the judges in this case.

12         MR. SISON:  And we have no intent to game any judge in

13   this case, your Honor.

14         THE COURT:  You have said what you are going to say on

15   that subject.

16         MR. SISON:  But the reality of it is, is that I can

17   tell you there is dispute over who owned those guns, who had

18   those guns, and we are still maintaining -- until I see

19   otherwise -- my client's version of the events.  So until I --

20   obviously, if I -- if I am led to believe otherwise or I find

21   otherwise, I will be the first to inform this Court.  But there

22   was a clear factual dispute on the basis of who had those guns

23   when we filed that motion to revoke.

24         THE COURT:  You would say that's something the Court

25   shouldn't consider.

1        *MR. SISON:*  I agree.  The reason why is because his

2    detention -- his bond was revoked, pursuant to Judge Proud's --

3    that punishment was there.  If he, indeed, lied to Judge Proud,

4    then so be it.  He was punished because he was removed off

5    bond, and I don't think that is a proper consideration for this

6    Court in the sentencing.

7        *THE COURT:*  Thank you.

8        *MR. SISON:*  Well, getting back, your Honor, to why we

9    believe the guideline sentence -- a nonguideline sentence is

10   appropriate here, you alluded to it earlier when you stated

11   that the mail fraud counts and the bankruptcy fraud counts were

12   sort of intermixed.  And I look at it and I just, you know, I

13   look at it and say the bankruptcy fraud maxes out at five

14   years.  The only reason this Court is considering the 97 to 121

15   months is because of the existence of mail fraud, but as I put

16   forward in my papers, if you look at the loss amount before the

17   mail fraud and attributable to the mail fraud, it only accounts

18   to anywhere between 30 to $70,000.  I think my calculations put

19   it around 40,000, $35,000, which is only 1.2 percent of the

20   total loss.

21        If you look at it from this perspective, you know,

22   yes, the mail fraud was part of this overall scheme, I grant

23   you that, but it was a means to effectuate the bankruptcy

24   fraud.  That's what it was, you know.  And that's why we

25   believe that the stat max on the bankruptcy fraud, the perjury,

1   and the false statements is appropriate here.  Because of the
2   extensiveness of the crime and because of the things that he
3   did to effectuate that bankruptcy fraud, we think the five
4   years max is appropriate.
5          And if you look to the calculations that I did to
6   formulate the nonguideline sentence, I took the six levels that
7   would have been added for the fraud due to the mail fraud and
8   subtracted it from the total offense level of 30.  And that's
9   because the mail fraud loss is already subsumed into the
10  bankruptcy fraud loss, already, pursuant to the guidelines.  So
11  I think that's an appropriate basis for a nonguideline
12  sentence.
13         We have to remember here, this is a first-time
14  offender.  I know that the crimes are despicable, and I know
15  that the crimes are disgusting, but he is a first-time
16  offender.  As a matter of fact, the Congress itself, in its
17  charge to the commission, stated that the commission should
18  come up with alternatives for first-time offenders, other than
19  imprisonment.  The guidelines don't account for that.  Not one
20  bit.  I mean -- and if you look at recidivism rates for
21  first-time offenders in comparison to other category 1
22  offenders, you will see they are a lot lower.
23         If you look at his age, he is 61.  You know, he's
24  asking for a second chance, and I think he deserves that second
25  chance.  You know, but putting him to a guideline sentence that

1    the government's requesting, even to the low end of the

2    sentence, could possibly amount to a life sentence for him.   He

3    is 61.   He suffers from Type 1 diabetes.   His mother died from

4    Type 1 diabetes.

5            THE COURT:   He is actually receiving insulin now?

6            MR. SISON:   My understanding is he is receiving

7    treatment for it, yes.

8            THE COURT:   Are you on insulin, Mr. Diekemper?

9            MR. DIEKEMPER:   I'm on the verge of it.   They still

10   got me on pills, but they're going to put me on insulin, sir.

11           THE COURT:   Okay.

12           MR. SISON:   But in taking into account his age -- and

13   I cited the Court to a number of cases, a number of cases where

14   courts have recognized the inverse correlation between the

15   length of the age, the age of the defendant, and the likelihood

16   of recidivism.

17           I mean, if five years in prison is not going to make

18   him learn his lesson, I don't know what will.   And I think it

19   is going to make him learn.   I don't think you will be seeing

20   him doing these crimes again.

21           The last thing that I want this Court to consider is

22   the collateral consequences that he has already suffered, and

23   that is an important factor that I do not believe the

24   guidelines properly take into account.

25           You sentenced -- this Court sentenced co-defendant

1    Margaret Diekemper to probation.  And, Judge, you can correct

2    me if I am wrong, my understanding of the ruling was that she

3    was not permitted contact.

4          *THE COURT:*  I did.  I ordered no contact out of

5    concern for her.

6          *MR. SISON:*  Right.

7          And I can stand here and question the validity of that

8    judgment, I'm not going to do that.  But what I'm going to say

9    is that for a man who has been married, who knows no other

10   person in life to love than his wife for 37 years, for him to

11   have serve his first two years, or whatever he is going to

12   serve in prison, without that support network, I think is a

13   pretty big punishment in my opinion.  And it is -- I mean, I

14   can't imagine if someone were to say, if I were to go into

15   prison, you can't see your wife, your kids, your children, for

16   two years.

17         It is these type of support structures that have a

18   man -- that when a man or a person goes into jail, it gives

19   them hope, it gives them to say, you know what, I can see the

20   light at the end of the tunnel.  I can do better because

21   they're there for me.

22         I'm afraid, your Honor, that if you impose a guideline

23   sentence, whether it be 97 or 121, that's eight to ten years,

24   she might not be there when he gets out, and that would be the

25   ultimate tragic thing in this case.  Because he understands

1    what he's lost.  He's not only lost his wife -- he potentially

2    lost his wife.  Right now he has lost two kids, two kids that

3    won't have anything to do with him.  You saw the letter from

4    Tracy Diekemper.  She basically said that she was ashamed of

5    him.  She's not going to see him, nor is she going to allow her

6    grandson to see him.

7         And then Troy -- I mean, the oldest son, he hasn't

8    visited him in the entire nine months that he's been to Clinton

9    County Jail.  So if you look at collateral consequences, I

10   think those are pretty severe.

11        That's not the only collateral consequences.  If you

12   look at the press coverings around that case -- and I barely

13   read a quarter of it.  This guy's been -- they just basically

14   sent him to the gallows.  I grew up in a small town.  I know

15   what it's like to grow up in a small town.  I grew up in a

16   small town called Olive, Louisiana; it's about 2,000 people.

17   Carlyle is about 3500.  I know what it's like when a big story

18   hits and --

19             THE COURT:  What part of Louisiana is that from?

20             MR. SISON:  Central part of the state, your Honor.

21        And I know what it's like.  You have friends on

22   different sides of the aisle.  Mr. Diekemper is a liar or a

23   cheat.  And the other side, he is a good man, give him some

24   consideration.

25             And I can tell you, I advised this man when he got out

1    of prison, that Carlyle is probably not the best place for you

2    to return to.  That's what I told him.  And you know what he

3    told me?  He goes, you know what, I got to live with it.  I got

4    to live with it, you know.  If I'm going to make my life worth

5    something, I got to convince these people that don't believe in

6    me that I'm actually a decent person.  That despite the bad

7    that I've done, that I'm actually a decent person.

8           And that shocked me, because if it were me, I'd move

9    to another state.  I wouldn't show my face in Carlyle ever

10   again.  And for him to tell me that, shows a little bit of a

11   signal of his tenacity, of his courage, and of his character

12   that he's willing to face the music, so to speak.  He's willing

13   to face these people that he's lied to, that he's cheated, and

14   say, you know what, I'm asking you for a second chance.

15          And in the final analysis, all we're asking for this

16   Court to do, you know, is to consider these 3553(a) factors,

17   because, you know, what good is justice without hope?  An

18   eight- to ten-years sentence for Mr. Diekemper would deprive

19   him of that hope.  He wants that opportunity to have a second

20   chance and I think he deserves it, after his does his time in

21   prison, there is no question.

22          *THE COURT:*  Thank you.

23          Ms. Hudson, is there anything -- I'll give you a

24   chance, is there anything you would like to rebut at this time.

25   You are not required to, but if you would like to, I will give

1    you that opportunity.

2         MS. HUDSON:   The only thing I'd like to say is I

3    respectful disagree that 61 is old.  I respectfully disagree

4    that 71 is old.  I respectfully disagree that Mr. Diekemper is

5    on the verge of insulin unless somebody else proves it to me

6    other than him.  I think that a guideline sentence is something

7    that both he and his wife can survive.

8         Thank you, your Honor.

9         THE COURT:   The Court is encouraged to hear that 61 is

10   not old.  And I'm not going to ask my court security officer

11   how old he is, but I would -- he's beat that by several times

12   and --

13        MR. ROSENBLUM:   I second that.

14        THE COURT:   And I'm reasonably sure that he could

15   still whip about 80 percent of the men in this courthouse, but

16   that's not the test.

17      I've considered all of these matters, of course, and the

18   case comes down to where it always does now in the scheme that

19   we're under, that's 3553.  And indeed, Congress has stated that

20   the Court should not impose a sentence -- should impose a

21   sentence that is sufficient, but not greater than necessary to

22   comply with the purposes set forth.  And I've particularly

23   considered the nature and circumstances of the offense and the

24   history and characteristics of the defendant.  And that's where

25   we are to start.

1    And the nature and circumstances of the offense:  Well,

2    they're aggravated.  There's no question about that.  This is

3    not a one-time, thoughtless, stupid act.  This defendant, over

4    a period of time, repeatedly lied to a United States judge,

5    bankruptcy judge, and did all things necessary repeatedly to

6    support, cover up, or energize that lie.  Make it work.

7    Mislead a magistrate judge.

8        You had total disrespect for the law.  Mr. Diekemper had it

9    in his mind, however it got there, that he was going to do

10   things his way.

11       Now, it is true that -- and I can say this with a little

12   authority -- when you live in the country and you are largely

13   self-sufficient, and you don't come into contact with the

14   authorities each day -- and by the way, that's the way I like

15   to live -- you don't have to answer as often.  But you are

16   required to comport with the law.  And this man didn't do that.

17       Circumstances of this crime are aggravated, without respect

18   to the sentencing guidelines, they're just aggravated.

19   Bankruptcy exists for a reason.  And, of course, the

20   circumstances that this country finds itself in right now

21   validate that.

22       Now, it would be one thing if when the defendant was

23   engaging in bankruptcy fraud, he was trying to assist his

24   grandchildren and his children, but he wasn't.  He was flushing

25   it down here at the gambling casino.  That's what he was doing

1   with the money.  Over a hundred thousand dollars.  And I
2   understand that gambling is legal in the state of Illinois.
3   And our elected representatives have determined that this is a
4   good thing and the gambling business is good for the state, and
5   we get taxes from it and we don't punish people for that.  I
6   understand that.

7       But to say that you love your family, but to take the money
8   that you are acquiring, however you acquire it, and flush it on
9   a gambling boat instead of giving it to your family, let alone
10  your creditors, doesn't say -- it doesn't say much at all for
11  the defendant.

12      Now, I do have to consider -- and Mr. Sison has made a
13  tremendous argument here, that as far as we know, for the first
14  part of his life, about the only thing bad you could say about
15  the defendant was that he was a royal pain in the behind.  He
16  was a difficult man to live with and a hard man to like, but
17  that's not a crime.  That describes a large part of my family,
18  probably, and probably yours too, if you were honest about it.
19  But he did, apparently, or at least he got caught relatively
20  late in life in a course of conduct that you -- that's rather
21  stunning.

22      I don't doubt -- and how could I doubt when a man says he
23  loves his wife.  God knows he had reason to love her.  She put
24  up with a lot more than just about any woman I know would.  And
25  the things she got, the appreciation she got was to get her

1    involved in a federal indictment.

2        There are judges who would have put her in prison for what

3    she did.  Would not have even blinked.  And these lawyers here

4    know it.  They know that.  And to cause that sweet soul to go

5    to prison doesn't speak much for this defendant.

6        And her children -- when your children turn on you, his

7    children didn't turn on him because he committed a crime.  His

8    children turned on him because they looked deeply inside their

9    dad, and they didn't see anything there that was good or

10   worthwhile.  That's the problem with the children.  That's not

11   the Court's fault or the prosecutor's fault or anyone else.

12   That's Mr. Diekemper's fault.

13       And if you can get to be 60 years old and still abuse

14   yourself with the idea that if you have a nice farm or good

15   job, you are a success in life, well, of course the remainder

16   of your days are going to be miserable.  That's the most

17   bankrupt idea of life that one could imagine.  It's just a

18   fact, the older you get, what you have becomes less and less

19   important, unless you are twisted.

20       So he's here and he has committed a very serious crime.

21   And the Court is also not in the least apologetic about keeping

22   Mrs. Diekemper away from him.  I don't want her abused any

23   more.  I don't want that woman abused any more.  And, yes, he

24   would like to have some support, but, you know, the Court can

25   only act on what is -- what is before it.

1    So it's an aggravated crime.  The defendant has shown a

2  total disrespect for the law throughout this entire proceeding.

3  And it's very problematic, very problematic, whether, as we sit

4  here today, this defendant appreciates the authority of the

5  Court, but he will.

6    Now, the need for the sentence imposed to reflect the

7  seriousness of the offense.  It is a serious offense.  It's

8  serious for all the reasons that we've heard about and talked

9  about here today.  The number of people that are involved, the

10  lives that are touched, and the flaunting of the authority of

11  the bankruptcy court.

12    To promote respect for the law.  Many of you have heard me

13  in this Court many times say that I'm not -- I don't get

14  carried away on this question of deterrence.  If long, hard

15  sentences were the answer, East St. Louis would be heaven on

16  earth.  And I dare you to go out and take about an hour stroll

17  around East St. Louis by yourself.

18       But one of the few places that it does work is in the

19  white collar crime area.  People that have always had

20  comfortable lives and lived well and had a family, they're

21  stunned when they see their neighbor go to jail.  They thought

22  these laws were only for these kids down here in the city.

23  These dope addicts, as they say.  It never occurred to them

24  that these laws would bind on them.  And when it happens, it's

25  hard and harsh.

1        Deterrence works in the case of the white collar area.

2   And Mr. Diekemper's friends are going to see this.  They're

3   going to know it.  He is not the first farmer to try to weasel

4   out of some honest debts by using the bankruptcy court.  And

5   his neighbors will see this.  It will promote respect for the

6   law.

7        Now, to provide just punishment for the offense.  This

8   can mean a lot or it can mean a little.  And it's not hard for

9   me to believe that Mr. Diekemper, at his age, having done what

10  he's done to his family, to his community, and to his friends

11  has certainly suffered a lot of collateral damage.  Apparently,

12  at one time, not only was he a member of the community, if you

13  believe the evidence in this case, I think people were actually

14  afraid of him.  Where he is going, no one will fear you.

15       No one will ever fear you where you are going.  You

16  may experience fear, but you will not be feared.

17       To protect the public from further crimes of the

18  defendant.  I don't place a lot of weight on this one.  I don't

19  think this defendant is going to be in a position to commit any

20  more crimes.  That's not a serious issue.

21       Finally, to provide the defendant with needed

22  educational/vocational training, medical care, and the like.

23  That's not an issue either.  Give the man his due.  He's a high

24  energy, has been a hard-working man who knows how to make a

25  living, and if given the opportunity, he will make a living

1    again.

2             And, of course, the only sentence that's authorized

3    this defendant is a sentence of imprisonment.

4             So what is an appropriate sentence in this case?  They

5    say that we simply nod at, give consideration to the

6    guidelines.  And that's what I've done in this case.

7             As I see this case, under any circumstances, I would

8    have given Mr. Diekemper ten years in federal prison, not five

9    years.  I would have given him at least ten years in federal

10   prison because of the nature of his conduct.

11            And so it is today.  He is sentenced to the Bureau of

12   Prisons for 120 months, and I do this in the teeth of one of

13   the best arguments that I've heard, and I've heard some good

14   ones.  But I believe the seriousness of the offense and the

15   manipulative, narcissistic characteristics of this defendant

16   require it.  I believe that there is a great risk that he would

17   manipulate and take advantage of others if given the

18   opportunity.  And I'm not going to be the one to do that.

19            120 months in federal prison.  And then that will be

20   followed by three years of supervised release.

21            I'm not going to fine the defendant.  There is no

22   reasonable way he could ever pay a fine, particularly in light

23   of his financial situation.  There is no restitution.

24            There is an assessment of $400.  And that will be paid

25   out of his prison trust fund account, and the financial

1    responsibility officer will take care of that.

2          Now in the event the defendant is able to live out his

3    sentence, when he is released, he has 72 hours within which to

4    report in person to the United States probation office.

5          Then he shall not commit another federal, state, or

6    local crime.  And I will remind you, Mr. Diekemper, federal

7    supervised release does not mean that you are a free man by any

8    means.  You will live by our rules.  And the United States

9    probation officer is the arm of this Court.  And when you speak

10   to that probation officer, you are speaking to me, and if

11   there's any disrespect shown, it will come back to you in

12   spades, so to speak.  I don't expect that will happen.

13         You will not commit another federal, state, or local

14   crime.  I'm going to waive the mandatory urinalysis testing and

15   drug counseling.  There is no history of that.

16         You will not possess a firearm or destructive device.

17   Now I will tell this -- in addition to violating supervised

18   release, that's another federal crime.  That will get you ten

19   years, so if you are able to get a few years out here, you can

20   sure forfeit it quickly if you get a weapon.

21         You must cooperate in the collection of DNA.  Your

22   businesses, your computers, your automobiles, your residence

23   will be searched at reasonable times if the probation officer

24   has reasonable grounds to believe that you've violated a

25   provision of your supervised release or if you possess

1    contraband.

2         The -- I'm not going to make any arrangement as to the

3    $400 that will be paid out of your prison wages before you are

4    ever released.  In the unlikely event it's not, it will be paid

5    out of while you are on supervised release and it will be paid

6    in four equal monthly installments.

7         And also, if you were to get an income tax refund, win

8    the lottery, recover a judgment, or have any other unexpected

9    financial gains that must be reported immediately.  The

10   obligation is on you and that will go to -- if there is any --

11   outstanding obligations.

12        I'm not sure there are in this case.  I don't know

13   where we stand in the bankruptcy court.

14        Linda, do you know?

15        *PROBATION OFFICER:*  I do not know.

16        *THE COURT:*  Actually, that provision is not

17   applicable.  It just doesn't apply here.

18        Then there are a few things you should note.  I think

19   you have -- this is an open plea, isn't it?

20        *MS. HUDSON:*  Yes, your Honor.

21        *THE COURT:*  So you do have a right to appeal,

22   Mr. Diekemper.  And in that regard, my clerk will today prepare

23   and file for you a notice of appeal if you request her to do

24   that.

25        Check with your lawyers and then tell me if you wish

1    for her to do that.

2         MR. SISON:  Your Honor, we'll let you know in the next

3    couple days.

4         THE COURT:  All right.  And then, of course, you have

5    ten days within which to cause a notice of appeal to be filed.

6    In the event you are a pauper and could not afford counsel, the

7    Court would appoint a lawyer to represent you at no expense to

8    you, and even provide a transcript of the sentencing hearing

9    and all other matters for purposes of your appeal.

10        Now, Ms. Hudson, I'm not asking whether you agree with

11   anything I've done here, but is there anything I've overlooked,

12   misstated, left undone, that needs to be taken care of now?

13        MS. HUDSON:  No, your Honor.  Thank you.

14        THE COURT:  Ms. Fletcher?

15        PROBATION OFFICER:  Nothing, your Honor.

16        THE COURT:  My clerk is informing me you were going to

17   dismiss some counts?

18        MS. HUDSON:  Yes, your Honor.  We do move to dismiss

19   the remaining counts, other than the four that have been pled

20   to.

21        THE COURT:  They will be dismissed with prejudice.

22   That will be Counts 3 through 18.

23        Now, I'll ask defense counsel, not if you agree with

24   anything I've done, but is there anything I've left unsaid,

25   left undone, misstated that need to be corrected?

1           MR. SISON:  Just one minor thing.  If the Court would

2      make a nonbinding recommendation to the Bureau of Prisons that

3      he be housed in a facility as close to the Illinois area as

4      possible.

5           THE COURT:  I will.  And what I'm thinking, probably

6      Greenville would be as close as we could get to home.

7           MR. SISON:  Yes, your Honor.

8           THE COURT:  And the Court will do that.

9           MR. SISON:  Thank you, your Honor.

10          THE COURT:  That being the case, and there is nothing

11     further before the Court, the Court is in recess.  The

12     defendant is recommended to the custody of the United States

13     Marshals service.

14                      *(End of requested transcript)*

15                             -oOo-

16                      REPORTER'S CERTIFICATE

17          I, Molly N. Clayton, RPR, Official Court Reporter for the
       U.S. District Court, Southern District of Illinois, do hereby
18     certify that I reported with mechanical stenography the
       proceedings contained in pages 1 - 52; and that the same is a
19     full, true, correct and complete transcript from the record of
       proceedings in the above-entitled matter.

20

21               DATED this 4th day of September, 2009.

22

23                        *Molly Clayton*
                          _____
24                              Molly Clayton, RPR

25